Thank you, Your Honor. May it please the Court, George Hayes, Naomi Mover, and Durf Johnson, representing Montana Environmental Information Center and their citizen members, and I'd like to reserve five minutes for rebuttal. All right. Please be aware that the time shown is your remaining total time. Thank you, Your Honor. All right. Citizen petitioners asked this Court to vacate EPA's approval of Montana's infrastructure SIP. This action by the Court would be warranted under the Court's rulings in the Hall and Bar cases, which find that an agency is arbitrary and capricious if it fails to follow its own guidance or if it fails to analyze a critical piece of information when taking an action. And EPA violated those precepts for three reasons. First, when EPA proposed to approve Montana's infrastructure SIP, the citizens pointed out to EPA that the state was making improper legal interpretations that improperly narrowed the scope of their PSD program. In 2013, number two, EPA had issued guidance for what are the minimum elements required for an infrastructure SIP and specified that with respect to PSD, the program is supposed to have all structural elements necessary and defined that to mean all provisions necessary to cover all PSD sources. However, when analyzing the submissions, EPA refused to look at these legal interpretations, saying that that was out of bounds and beyond the scope of what it would look at. And the result was that by EPA burying its head in the sand in this way, it failed to look at this critical information and, therefore, allowed the scope to continue with these interpretations that improperly narrow the scope of the PSD program in violation of EPA's own applicability regulations. And, therefore, since the scope of the program is improperly narrow, EPA has violated its own guidance, which says that PSD programs have to have all provisions necessary to implement the program. Sotomayor, I'm kind of struggling with exactly what the dereliction is that you're talking to, that you're asserting. Are you asserting that the actual provisions of the State Implementation Plan deviate from the regulation? The actual provisions of the State Implementation Plan are ambiguous. Well, but that didn't answer my question. My question is, are you arguing that the provisions of the plan deviate from the EPA regulation? Yes, in the sense that in order to understand what the provisions are, you need to look at the regulatory language plus necessary interpretive legal interpretations that go along with that language. Let me try that question again. On its face, do the provisions of the State Implementation Plan deviate from the regulation? You can't tell from on its face. It's impossible to tell whether the program is sufficient on its face. What the EPA's own guidance says is look at all provisions. It doesn't violate them. Pardon me? It doesn't violate them. It actually does. EPA issued guidance for PSD 51-166A7, which says that applicability provisions alone need to be as stringent as what they lay out in those regulations. And if the State's applicability provisions aren't as stringent as those provisions, that's a violation of that regulation. In essence, to me, it seems that your complaint is in the way the State is interpreting the plan, not in the way the plan is written per se. That's right. So it's an implementation. To me, your beef is with the way the State implements this implementation plan, not the actual plan as approved by the EPA. Do you understand the distinction I'm trying to make? I — well, I understand the distinction, but I don't think that that distinction fits with EPA's own guidance. What EPA says is that the State has to have all provisions necessary to cover all PSD sources. If you just look at the regulatory text on its face, you can't tell whether all sources would be covered. And this goes back to how EPA wrote the original rule where they were looking at baselines, and they say a baseline is a two-year period prior to a project. And you can't tell from that language which two-year period should be used as the baseline. Should it be the two years immediately preceding? Should it be five years immediately preceding? But EPA backstopped that language with interpretations that it published in the Federal Register saying the two-year, you know, two-year — a two-year period means the two-year period immediately preceding, and then it went through a series of weakenings. But it's always specified what it meant. But we don't know if there's any problem until they pick the wrong period, do we? We'll never know whether the State has picked the wrong period, the way they implement the program, because they allow sources to pick any baseline, no matter how far back in time. EPA limits power plants to going back five years. The State would allow a longer period. They would allow other power plant sources. EPA would allow ten years for sources to look back. Again, the State allows an unlimited period of time. And, in fact, there's no — there is no requirement — there's no possibility of going beyond the ten years according to the EPA regulations. So what you're suggesting is that if the State of Montana decides that they can go any two-year period well beyond the ten-year limit that's set in the EPA regulations, that's a clear violation of what the EPA regulations would require. That's right. Isn't that correct? So there's levels of regulation here. EPA's regulations with respect to PSD say their applicability provisions must be followed. The State, by having these — using these legal interpretations in combination with this ambiguous language, is not following. Right. So you're looking at the way — the way of interpretation by the State of Montana, and you're saying that the interpretation itself means that they are not in compliance with the SIP. They're not in — well, they don't have a minimally compliant SIP because of the way they're doing these interpretations. So your approach is now to attack the awarding of the State plan. And the EPA says, well, you know, we don't want to get beyond the actual literal compliance with the regulations, and that there are other opportunities that you have to be able to object to the implementation of the SIP. And I'm wondering if that is, in fact, true. Are there other ways in which you could oppose the way Montana is interpreting the baseline emissions standards? In which case, this becomes all an academic question, whether, you know, you oppose the SIP itself or whether you decide to file another objection and have access to judicial review in some other way. So my question is, do you have other avenues of attacking what Montana has done in assessing baseline emissions? EPA mentions five ways that they think are alternatives. One is a 113A2 order, and another is a 167 order. Those are orders by EPA against a source that they are saying they made a major modification and they're in violation. And another would be a Title V petition where the citizens would point that out to EPA. And with respect to all of those options, either EPA or the citizens would have to know that an improper baseline was being used. And the way Montana is operating this program, you wouldn't know, because there's no public notice regarding what baseline should be used. So none of those actually involve the correction of a program. They only involve going after a particular source. There's one other option, which is a 113A5 order, where EPA can take over the program. But again, citizens can't do anything to force that action. So of the five options that they've listed, none of them would provide the relief that we're asking the Court to provide here, which is saying, EPA, you're not following your own guidance by allowing these legal interpretations to stand, therefore vacate the order. Kennedy. And can I ask a broader question, just from the perspective of public policy? If in fact this Court rules in your favor and suggests that EPA has to make this assessment, not only of the specific SIP that's proposed, but also how it's being implemented, at least to some extent, and this would be applied nationwide, what kind of impact would that have on EPA? In other words, is it a big deal? Is it a big deal that we suggest that EPA should take on this responsibility? Well, no, Your Honor, because we're not asking EPA to, you know, undertake some big open-ended review. What we're saying is when it's pointed out to you that the State has created legal interpretations which improperly narrow the PSD program, then consider it. That's all. We're not, you know, so we're we've put In other words, when an organization, mostly an environmental organization, raises a question as to how, in fact, these the SIP is being implemented, that is enough to require EPA then to make this independent analysis as to whether, in fact, those regulations are in compliance. And my question is, I mean, does this, practically speaking, open up a huge door to a new responsibility for EPA? And that is, you know, whenever an environmental organization raises the question, that's enough to require this new added responsibility. Your Honor, there's no big added responsibility here. Every time EPA goes to approve a SIP, there's a notice and comment provision. Citizens or companies comment on what EPA is proposing to do, and it actually would be arbitrary and capricious, sort of a violation of due process, if EPA failed to consider those comments. So here, we've basically commented saying the State is using legal interpretations. No, but it's an interpretation. Here's what's troubling me. It's an interpretation that applies to new point sources or modifications. Isn't that right? I mean, isn't that what we're talking about? We're talking about an interpretation regarding how to determine baseline and whether there's been a major modification. In the PSD. In the PSD comment. Every time you have a major change, you're going to end up with this particular analysis. That's right. And EPA has specified by rule, these are the allowed parameters, and the State has decided to interpret. I understand that, but when they use the wrong analysis, why is that secret? You say we'll never know. I don't understand that, because you've got an evaluation of modifications or of a new source to see whether they're compliant. Let's say I'm a source, and I decide that I'm going to make a modification. So I look back through my entire history of operation, and I pick a baseline that is from 25 years ago. And I say, well, I was really running hard then. That's the emissions level that I'm going to use. And then they go ahead and construct. They don't need to tell the State. They don't need to tell citizens or EPA. No one would ever know. They just make the decision, and they go ahead and construct. That's the way Montana is operating the program. And so there's no notice and comment provision. This source just decides for itself. Maybe they make a note in their own file and go. So unless you're actually in litigation with them, and you've somehow happened to try to ---- There's no approval process by ---- No. No. That's right. And, in fact, EPA's approval ---- Not by a State, not by the Federal government. No. That's correct, Your Honor. The ---- That's the gravest concern, it seems to me, that, in fact, what you're suggesting is that Montana has the ability just to tell people, you use whatever two-year period you want, well past the 10-year period first, and, second, nobody has to approve it, which is the major change from EPA regulations. And your point is, I guess, is that because nobody has to approve it, nobody would know this is ever happening, and as a result, all of these other remedies are inefficient, because nobody knows that, in fact, someone else was given the authority to go approve whatever two-year period they wanted, and that the SIP, therefore, would be the only way, a SIP review would be the only way in which there would be full knowledge and disclosure, and at that point, EPA should be obligated to explore whether these Essentially, Your Honor, what EPA said with respect to power plants is, if you want an alternate baseline beyond five years, come into the agency and prove, demonstrate that your desired baseline is more representative of normal operations. And then the State, the permitting authority has to make that determination. That's how it would come to light. Now, the State may get up here later and say, oh, well, we have inspectors, and we have a minor source program, and there might be ways for us to find out. But that, again, would never make it to the light of day where EPA would know or citizens would know, and perhaps the inspectors or these programs, which aren't designed to be looking for PSD issues, none of that would actually ever come to necessarily come to the light of day. What is it that you want us to do? We want you to vacate this approval and require EPA to consider these legal interpretations in its determination of whether the infrastructure SIP is approvable. But how would you do that? How would you set the line between EPA not having to do any additional investigation and then EPA having to do an additional investigation? I mean, there has to be some line. Otherwise, you open up Pandora's box to every particular adjustment. For instance, there were five air adjustments, ambient air adjustments, over a five-year period. Every time requires this kind of review. If, in fact, you open up EPA's responsibility to make individual determinations without some sort of limiting language as to when this is in play, then you just really, you know, overbear the organization. I understand, Your Honor, but we're not actually asking to open up anything. All we're asking is for EPA to follow its own guidance, which means the guidance says look at all provisions necessary to determine whether the program covers all sources. Provisions doesn't mean just the regulations themselves. Provisions could mean, if you look at the guidance, they talk about this, narrative explanations that the State provides or legal interpretations or attorney general opinions. It's a pretty small set. It's what provisions is the State using to actually operate its program. So that would include only the regulations plus any legal interpretations that the State is using. We're not talking about opening anything up. We're just saying, EPA, follow your own guidance, which says look at the provisions that are necessary to operate this program. So then what you're suggesting is just add the State's legal interpretations of these regulations and limit that particular, limit the review process to that specific added factor. Correct, Your Honor, unless, you know, maybe the State has an attorney general opinion that they're also using to define the parameters of their program. Well, then consider that. But, you know, usually, you know, the State has a very defined set of operating parameters for how they structure their program. All we're saying is this is a critical operating parameter, and EPA has chosen to not look at it, and that's a violation of its own guidance. All right. Thank you, counsel. You're down to a minute. You want to save that for rebuttal? All right. We'll hear from the government. Good morning, and may it please the Court. My name is Sheila Baines, and I represent the United States Environmental Protection Agency. With me at counsel's table is Randall Cherry from EPA Region 8 Office of Regional Counsel. I will be ceding the last six minutes of respondents' time to counsel for the two interveners. In support of the United States' position that MEIC's petition should be denied, I have three main points. One, the Clean Air Act requires that EPA determine that a State's infrastructure SIP submission contains the relevant structural components outlined by the Act, not that EPA affirmatively investigate alleged failures to implement that plan properly. Two, EPA decided in the challenged action that Montana's infrastructure SIP submissions contained those structural components with respect to its PSD program, and that decision was not arbitrary, capricious, or otherwise contrary to law. And three, contrary to MEIC's assertions in their reply brief, EPA did, in fact, address MEIC's comments regarding Montana's recent statements interpreting its baseline emissions definition. In the final rule, EPA explained that while it takes those assertions seriously, the infrastructure SIP approval process is not the proper avenue to investigate issues with a State's execution of its plan. First, we ask the simple question, what does the statute require of EPA? Both the plain text of Section 110A and the overall structure of the Act support EPA's interpretation of its statutory duty, which is to assess whether a State's submitted plan includes and contains the listed elements in Section 110A2. That duty does not require EPA to look beyond the submission itself and investigate any potential ---- Kagan. Kagan. Elson. Elson. Can I just ask you a hypothetical? You obviously take the position that you literally apply these particular regulations, you compare them, and if they comply, just generally speaking, with the law, that's fine, and you're not going to look beyond that. Just hypothetically, if you had knowledge, as you're going through this SIP process, you had knowledge, first of all, of the purpose of the statute, and that is protect against ambient air violations of the Clean Air Act. That's the overall purpose, right? So then you're given a SIP, and obviously it meets all the compliance, but then you know from some other source, some other regulation by the State, that they're going to do just the opposite, that they're not going to actually comply at all with the purpose of the Clean Air Act, but they're going to be something completely different. Your position would be, can't do anything about it. You have to give them a State plan. You have to find compliance. Is that correct? If, in fact, you know that the State is interpreting, by regulation, the law in such a way as to really violate the purpose of the Clean Air Act. I appreciate the question, Your Honor, and standing here today, I can't say that there's no circumstance in which EPA would not take action. Obviously, if it was clear to EPA that there was bad faith on the part of a State in its circumstances under which EPA would take action. But that you're not going to take a hard line and say, we're never going to assume, we're never going to interpret some underlying facts in a given situation in our assessment of approval of the SIP? Today, I won't say never. I won't take that categorical position. I believe it's 110A to E. Why does the government never say never? You never say never. Let me ask you, you indicated that this is a problem with respect to failure to implement. So how would, if they fail to implement properly, and they use the wrong measure, how would you ever, how would we ever know that? How do we take action? How do we prevent that from happening? Well, in terms of the tools that are in the Clean Air Act toolkit, I'll highlight six today that are tailored to address implementation issues, which the SIP, infrastructure SIP approval process is far from tailored. It's not intended to address implementation. But there are six that are tailored in that fashion. One is 113A2. That creates a process for when a failure of the State to enforce the SIP effectively has resulted in widespread violations. We also have 113A5, which empowers EPA to issue stop construction orders, administrative penalties, or bring a civil action whenever the administrator finds that a State is not acting in compliance with the requirements related to the Act. Thirdly, I'll highlight Section 110K5. That's the SIP call provision of the Act. And a SIP call can be initiated whenever an applicable SIP is substantially inadequate or necessary for a State to otherwise comply with the Act. And the SIP call authority is very broad, and it can force corrections, of course, of a SIP. Well, but the argument that we just heard was that if there is a modification of a source, they'll just modify it and we'll never know what period of time they're looking at in order to determine that they comply. Well, Your Honor, because under the Act, the AIR program in Montana, the PSD program specifically, is administered by the State. I'll let the State speak to the ways that they do gather information and do monitoring, auditing, inspection, and would be able to catch those types of instances. But I would like to go through the other three. Okay, but there's nothing under the Federal law that would... Well, the Federal law here is the State program, which becomes Federal law once it's approved by EPA. And the State is administering that. So the fourth tool that I'd like to highlight is 167. That's a PSD-specific measure. And that was highlighted by Alaska Department of Environmental Conservation versus EPA, a Supreme Court case that highlights the broad authority of EPA to act when PSD is not being implemented. Fifth, I'll point to 179A4, which can result in sanctions if a failure by the State to implement is not corrected. And lastly, and most importantly, I'll point to a sixth tool, which is Section 304A3, which is a citizen's group from a group like MEIC if a source fails to get a PSD permit when it should have. And we know that MEIC knows how to do that, and they've done that in the past. The district court litigation that gave a rise to this petition was just such a citizen's suit in which MEIC determined under their opinion that a source had failed to get a permit, and they initiated a Federal Enforcement Act against that source. Counsel, the particular complaint that the petitioners have is whether or not the State implementation plan mirrors 40 CFR Section 51.166B47i. Do you agree? And so that would be the baseline emission definition? Right. Yes. So is it your position that the provision in the State implementation plan contains language that's identical to the language in 40 CFR Section 51.166? It's not identical to the current language that EPA uses, but it is identical to the language that EPA used starting in 1980 up until 2002. And EPA has long taken the position that that 1980 baseline determination regulation continues to satisfy the requirements of the Act. The 2002 NSR reform rules are broadly understood to have been deregulatory in nature, including notably here by MEIC themselves. They stated in their comments on this rule challenged here that, quote, the 1992 and 2002 Federal rule revisions were intended to be less inclusive than the 1980 PSD rule. And where in the record, I mean, the 1980 rule is found where? What's the CFR site for the 1980 rule? The EPA version of that rule? Exactly. Because you said that the State implementation plan is identical to the language in the 1980 rule, right? Yes. And so where is that 1980 rule? Where can I find that? I have that in my brief, if you don't mind my grabbing that. Okay. All right. Thank you. The only notable difference there is that the Montana version of the rule inserts numbers, one and two, in front of two of the clauses in the rule. Because I was looking at the current version of 51.166, which talks about the baseline emissions are calculated during any consecutive 24-month period selected by the owner or operator within the five-year period immediately preceding the beginning of construction. Okay. So that would be the later regulation. The 1980 regulation, I have it here on page 12 of the government's brief. I mean, but do you have a physical copy of the regulation, not just a citation to it? Where is it found? You know, where can I find it in the CFRs? It's at 40 CFR section 51.24B21. 40 CFR section? 51.24B21. Little B? Little B21 from 1981. 1981. Okay. All right. And I also have that at 45 Fed Register 52729 from August 7th, 1980. 52729, August 7th. Okay. Thank you. So can I ask you a couple of questions about how that's a baseline emissions standard, how it's implemented? It's for some power plants five years, other power plants up to ten years. My understanding is that the five years can be extended, any two-year period can be extended, assuming that it's more in compliance with what the standard operating procedures are of the plant. But the ten-year cannot be extended beyond ten years. Is that correct? For that category of sources, that's correct, Your Honor. Okay. So apparently, at least according to Montana Information Organization, essentially they're suggesting that the State of Montana is taking the position that it can be any two-year period forever, which is obviously in violation of this ten-year limit. That's the first thing. And the second thing is that apparently nobody has to approve it, which is totally inconsistent with the EPA regulations. According to Montana, you could just pass on this baseline emissions standard without any supervision or control or regulation or review by any federal organization, which then suggests that somebody in Montana can just take a two-year period from 25 years ago and nobody would know about it. And that's the grave concern here. What's wrong with that scenario? Well, Your Honor, I would say that it's not clear on the record before the Court that that is less stringent if the rule is being interpreted in the manner that is posited by the petitioner here. It's not clear that that would be. Well, taking their proffer that it's being interpreted that way, that the two-year period can be up to 25 years or whatever, that clearly is in violation of EPA regulations, isn't it? I would say it's not a clear violation overall of the rule because at worst the petitioners have only demonstrated that at worst the two rules in the way interpreted, taking that for fact here for purposes of argument, that they're at worst at right angles to each other. And what I mean by that is that there are two axes on which we could measure stringency here. So one of the rules requires representativeness but doesn't impose that time limit that you mentioned. But the other rule, which does impose the time limit, doesn't have an explicit representativeness requirement. And so it's not clear from the limited record that we have here that it would be less stringent as interpreted in that manner. And in order to do that, EPA would need to decide that. EPA would need to fully develop a record on that question. They've not done that here, so it would not be prudent for me to take a position on that issue on EPA's behalf at this time. But more importantly, nor would it be prudent for the Court to opine on that issue without the benefit of a full administrative record and a determination from EPA in the first instance. Kennedy. There's no question. It would have to be a full administrative record. But the question is, wouldn't EPA really want to know that regulations have been adopted or procedures or practices adopted by the State of Montana, which are, as you say, at right angles with EPA's regulations, so that, in fact, your responsibility to ensure that the Clean Air Act is being complied with is, in fact, complied with? EPA would want to know that, Your Honor. And EPA would be very interested in hearing from Petitioners. We invited them to petition EPA to look at this question under one of the other statutory tools that is more tailored to address implementation issues. But this is not the context under which EPA is required to look at that. And that's the narrow question before the Court. What does the statute require? What would be the most appropriate tool that they could use to get EPA to look at this? I mean, there are a number of tools that vary slightly. If I were in Petitioners' shoes, I would petition EPA to do a SIP call under Section 110K5. And then when EPA responded to that petition, if EPA denied it, Petitioners would have judicial review of that denial, and they would be able to develop a record on that. And if EPA granted that petition, they would initiate a proceeding to address whatever issues might be happening. And I see that I'm cutting into my intervener's time. Can I just ask one question? I mean, essentially, what they're suggesting is because a part of the regular or the part of the way Montana is approaching this issue is not to require any kind of review. In fact, organizations can just set up their own two-year period. That suggests that nobody will know what happened. Petitioners obviously knew that that happened in the past when they initiated their citizen suit. Montana will speak to the ways that they can get that information. But before I sit down, I have one important point that I'd like to make in response to Judge Sessions, your question about the Pandora's box that would be opened by ruling in favor of Petitioner here. And that's a very good question. If the court were to impose this new and hefty burden on EPA that is not mandated by the Clean Air Act, that would have enormous consequences on the national administration of the Clean Air Act. Every time a national ambient air quality standard is updated, every state and air management district, there are over 50 of them, they must submit one of these infrastructure SIPs. And the purpose of those infrastructure SIPs is simply to assure EPA that the state has the necessary program in place with whatever changes might be needed to adapt to those new standards. If EPA is required now from a ruling like this to hypothesize and explore every possible interpretation of each state's regulations, even when, like here, they are identical to EPA's regulations or previous regulations, or if EPA must chase down every hint that a state is not faithfully executing its plan in every way, EPA's work would be severely hamstrung. That would transfer resources from other priorities, and that would disrupt the orderly process created by the Clean Air Act. There are a half a dozen other tools that are much more tailored to implementation issues that I've highlighted today. And in sum, I would just like to wrap up by encouraging the court to deny the petition. Thank you. Thank you, counsel. Stop the clock, please. May it please the court, my name is Norman Mullen. I'm a special assistant attorney general for the state of Montana and represent the Montana Department of Environmental Quality. May I ask, Your Honor, Talon has three minutes that it originally had. It had 20 minutes altogether, so. Thank you. That's what you have. Your Honor, I just wanted to mention in response to some of the questions that it's not any period that can be selected. The period has to be representative. Montana described in its brief and in the citizen suit brief that was filed as part of the record here that there's a fact-intensive site-specific analysis the state undertakes to review the aspects of a permit application and through the process that even if no permit application is filed, through meeting with the company, through inspections, through its emission inventories, through minor source reviews, through de minimis permit reviews, there are processes whereby Montana finds these issues and addresses them with the company or through actions. But is it true that none of that is done in public? Your Honor, there is no explicit requirement that a period selected outside EPA's presumptive 2 and 5 period, for instance, must be approved in a public process. Montana's records are open to the public, and MEIC and groups like it routinely go through those records and inspect them. Would records be generated of the discussions and the conclusions between Montana and the private companies? Yes. Okay. And so those would all be, I assume, public records that could be perused at the convenience of anyone who's interested. Yes, Your Honor. The other point I'd like to make is that the baseline period that the federal government rules require that MEIC has pointed to do not require representativeness, and Montana's do. So when a company might pick the 24 months in the five years preceding, they can pick that and there's no scrutiny, no information given to anyone differently from the way I just described that would alert someone to the fact that a non-representative 24 months had been selected, whereas Montana requires it to be representative. All right. Thank you, counsel. Thank you, Your Honor. Was there one other attorney? All right. We'll give you two minutes. Thank you, Your Honor. May it please the Court. My name is Joshua Frank and I represent Talon Energy, Talon Montana, an intervener in this case in support of EPA. I want to focus on just a few things very quickly here. First of all, as you heard Ms. Bain say, for EPA, the issue here is whether EPA reasonably interpreted the Clean Air Act to only require a facial review. We see that Petitioner here has tried to intertwine these kind of very complex issues of regulatory interpretation with their concerns about how EPA undertakes its review, and they seem to be inviting the Court to weigh in on these very complex interpretations. And so the first thing I'd just like to say is that we hope the Court will not take up that invitation to actually get into the interpretations of the Montana SIP, and that if that were necessary, which we don't believe it is, that would only be handled under EPA. Can you just explain one thing to me? If you were to undertake a massive addition to one of your operations and make some comparison that is wildly inappropriate, how would these petitioners find out about it? Sure. It's a great question. I think that one important thing to point out is that even under EPA's current rules, there is no requirement under most circumstances for a company such as ours to submit anything to EPA or the state or to get approval, and you can find that at 40 CFR 51.166R62. But if there's a modification, then you have to get approval, right? No, that's not correct. There's no preapproval process. Oh, there's no preapproval process for any private company, and that's what you're saying? That's correct. Only for the state implementation plan? That's correct. It's between the state and the private company as to how the compliance with the state implementation plan is going to be achieved. That's right. These projects are undertaken all the time. There is, under the current rules or the past rules, no requirement to go in and get some sort of approval before you do a project. So that's a very important point. From the EPA, but you don't have to get it from the state either? No. So why are you having the discussions with the state if there's no requirement for the state to approve? Certainly. We like to have a good relationship with the state and make sure that we're complying with the regulations. So that's something that happens often. So in essence, your view is that you could just implement the project and then it would be up to the state and the EPA to bring in action if you were not complying with the regulations? That's correct. And that's, in fact, what Petitioner Army IC did previously.  that we were violating these baseline provisions. And, in fact, the court in Montana found that we were not, that we were interpreting them correctly and that Petitioner was not. So that's one thing I'd counsel here. But, of course, if this case isn't about you, it's about the state and the EPA. So whether or not they could bring an action against you is not really relevant for purposes of this case. I think that's correct. And that is the main point that I want to make, which is here all that you are asked to decide is whether EPA reasonably concluded that the Clean Air Act only required them to undertake a facial review of the regulations. And the answer to that question is yes. Well, your argument has a double-edged sword, doesn't it? Basically what you're saying is that if you want to modify any of your power plants, et cetera, you don't have to notify EPA. You don't have to get approval of anybody. You make an arrangement with the State, and as a result, there's no open disclosure. And so then obviously the plaintiffs in this particular case would say that's exactly why we need to get an active review in the SIP process, because in the SIP process, assuming the Court agrees with that, there's going to be an open disclosure of exactly what is being proposed, and there would be open candor. Because if it's just modification, as you suggest, you don't have to tell anyone, and nobody would find out about it theoretically unless there's an environmental group that is sensitive to meeting the regulations. Your Honor, I very much appreciate the concern that you're raising, but that's not one that actually deals with the SIP process. It deals with the underlying EPA regulations about PSD. That's how this entire program works. But the point is that that's why it's more important to make sure that the regulations are stringently adhered to, because once those — once this plan is approved, the public loses sight of what's occurring. That's true. I mean, we all want the rules to adhere to. I think the fact is, though, that these concerns that you're raising are somewhat endemic of just how the PSD program works. And so that's — that's an issue of a whole other rulemaking where EPA sets how — how this whole permitting program works. All right. Thank you, counsel. Thank you, Your Honor. Roboto. Your Honor, let me start by answering your question about the 1980 rule. So the rule is, as counsel stated, for the United States, was 5124. And what EPA said at that time was, you need to follow our interpretation — our definitions precisely or use ones that are more specific. Do you agree, though, that the language that's in the State implementation plan pretty much mirrors the 1980 rule? Yes, Your Honor. Okay. But again, when EPA put out that rule on August 7th, 1980, if you look at the preamble, there's an interpretation right in there that says, a two-year period means the two-year period immediately preceding the particular change. So at that time, the baseline — everybody knew what the baseline was. It was the two years immediately preceding. And by the way, when MEIC brought the action against the coal strip plant, none of these State interpretations had been issued yet. So I just wanted to correct the record as to that. In 1992 — You call them the coal strip plan, is that — Yeah. That's right. That's an interpretation. In 1992, EPA relaxed its rule for power plants and said, okay, instead of the two years immediately preceding, we're going to allow any two years within five years. But if you — if a source wanted a baseline beyond five years, they had to ask EPA and prove that the baseline was more representative. So it's not true that citizens would never find out. We would find out at that point. In 2002, there was a further relaxation where other non-power plant sources could get a 10-year baseline, but no alternates were allowed. Montana says you can use any baseline you want as long as the baseline is representative of normal operations. Well, to use one of these baselines outside of the window that EPA has approved, it has to be more representative, not just representative. And furthermore, who makes the determination? The source alone. They never ask the State to approve it or not. So it's all done by the source itself. The other thing I would add, Your Honor, is that with respect to the options which counsel laid out, one she mentioned was 110k-5. That was never mentioned in their brief. However, I will note that it's been two years since citizens pointed out this problem to EPA. If we issued a petition, we would do more than what we've already done, which is point out that there's a problem. What has EPA done? Nothing. And there is no petition process for this under the Clean Air Act, so it would just be under the ---- and that you essentially did not respond. Well, Your Honor, counsel is discussing a potential resolution of this matter, which we were happy to continue discussing it. The government is the one who cut us off and didn't pursue that. So, you know, I don't know that it's appropriate to be discussing that here. The point is that if we did a petition under the Administrative Procedure Act and EPA did nothing, we'd have to sue them for unreasonable delay just to consider the petition. And so that could take years and years and years. That is not a reasonable option. All we're asking is that EPA perform its duty now. They've never stated in any guidance that their review is only limited to a facial review. They only said that one other time in the context of an unreviewed Federal Register notice regarding a Texas SIP in 2011. There's no longstanding guidance as to that. The guidance says that EPA will consider all provisions necessary to have a complete program, and that's all we're asking here. We're not asking for anything more than for them to consider the provisions that make up the State's program. And in terms of bad faith, I would note this. That was discussed here. The State did not submit these interpretations to EPA for it to review as part of the SIP process. It just made these interpretations, and they're just acting on them. So EPA never gets the opportunity to weigh in on it. We've identified the problem, and under EPA's own guidance for infrastructure SIPs, EPA ought to consider that and take action appropriately. Ginsburg. All right. Thank you, counsel. Thank you to all counsel for your helpful argument. The case just argued is submitted for decision by the Court. That completes our calendar for today. We are on recess until 9.30 a.m. tomorrow morning. All rise. This court for this session stands adjourned.
judges: Schroeder, Rawlinson, Sessions